IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NARAL PRO-CHOICE OHIO, *et al.*, | ) | CASE NO. 1:05 CV 1064 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| GOVERNOR BOB TAFT, *et al.*, | ) | |
| | ) | |
| Defendant. | ) | **MEMORANDUM OPINION** |

This matter is before the Court on the Motion to Dismiss filed by Defendants, Governor Bob Taft; Kenneth L. Morckel, Director of the Ohio Department of Public Safety; and, Franklin Caltrider, Registrar of the Ohio Bureau of Motor Vehicles ("Defendants") (Document #19). For the reasons set forth below, Defendants' Motion to Dismiss is hereby GRANTED.[1]

**Factual and Procedural Background**

On April 27, 2005, Plaintiffs NARAL Pro-Choice, Ohio; Rachel Ulrich; Paul Burstadt;

---

[1] Motions to Dismiss have also been filed by proposed "Intervenor-Defendants" Cornerstone Pregnancy Services; Patrick S. Corrigan; Isaiah's Promise; Mary Ellen Urmin; Darlene Bishop Home for Life, Inc.; and, Ohio Choose Life, Inc. (See Document #s 20 and 21.) The Court has not ruled upon the Motions to Intervene filed by the proposed Intervenor-Defendants. (See Document #s 8 and 12.) As this Court finds dismissal of Plaintiffs' claims to be appropriate, the Court will not address the issues raised by proposed Intervenor-Defendants in their Motions to Dismiss.

and, Jan Beeman ("Plaintiffs") filed their Complaint against Defendants pursuant to 42 U.S.C § 1984, challenging Ohio Rev. Code §§ 3701.65 and 4503.91,[2] as enacted as part of S.B. 156, 125th Leg., Gen. Sess. (Ohio 2004) ("the Act"). Plaintiffs set forth three separate Claims for Relief:

> FIRST CLAIM FOR RELIEF
>
> R.C. §§ 3701.65 and 4503.81[3], as enacted as part of S.B. 156, 125th Leg., Gen. Sess. (Ohio 2004), impermissibly permit the expression of only one viewpoint - opposition to abortion rights - in a state-created forum for private speech by vehicle owners. It discriminates against Plaintiffs' opposing viewpoint by depriving Plaintiffs of the opportunity to express their support of abortion rights in the same state-created forum for private speech by vehicle owners. Thus, R.C. §§ 3701.65 and 4503.81[4], as enacted as part of S.B. 156, 125th Leg., Gen. Sess. (Ohio 2004), infringe on Plaintiffs' rights of freedom of speech in violation of the First and Fourteenth Amendments of the United States Constitution.
>
> SECOND CLAIM FOR RELIEF
>
> The policy and practice of issuing specialty license plates impermissibly permits the expression of only those viewpoints condoned by the General Assembly in a state-created forum for private speech by vehicle owners. It discriminates against those citizens with opposing viewpoints by depriving them of the opportunity to express those views in the same state-created forum for private speech by vehicle owners. Thus, the policy and practice infringes on Plaintiffs' rights of freedom of speech in violation of the First and Fourteenth Amendments of the United States Constitution.

---

[2] Briefs for both Plaintiffs and Defendants cite to Ohio Rev. Code § 4503.81. However, the applicable provisions referred to by both Plaintiffs and Defendants are found in Ohio Rev. Code § 4503.91. Ohio Rev. Code § 3701.65 also incorrectly cites Ohio Rev. Code § 4503.81, when in fact the applicable provisions are actually found in Ohio Rev. Code § 4503.91.

[3] See Footnote 2.

[4] See Footnote 2.

-2-

THIRD CLAIM FOR RELIEF

The Ohio General Assembly acts with unfettered discretion in approving "Choose Life" and other specialty license plates, while refusing to authorize license plates that convey a message disfavored by the legislature, such as "Pro Choice," in violation of the First and Fourteenth Amendments of the United States Constitution.

Plaintiffs set forth three alternative remedies: (1) a declaration by this Court that the Act is an unconstitutional infringement of Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution and preliminary and permanent injunctive relief enjoining Defendants and their successors from enforcing or otherwise carrying out the program of administration provided by the Act; or, (2) a declaration that Ohio's policy and practice of approving specialty license plates is an unconstitutional infringement of Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution and preliminary and permanent injunctive relief enjoining Defendants and their successors from enforcing or otherwise carrying out the program of administration provided by the state's specialty license plate scheme as found in Ohio Rev. Code. Chapter 4503; or, (3) a declaration that Ohio's policy and practice of approving specialty license plates is an unconstitutional infringement of Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution and an order from this Court requiring that Defendants and their successors open the specialty license plate process to all applicants who meet neutral and objective criteria.

The State of Ohio offers various specialty license plates to vehicle owners. In addition to the ordinary cost of obtaining a license plate, the vehicle owner pays an additional amount to obtain a specialty license plate, which is allocated to a particular program by the State legislature. "Choose Life" license plates may be purchased for $30.00, $10.00 of which is used to cover the

actual costs of the plates, and $20.00 of which is deposited into a "Choose Life" fund and distributed to organizations meeting certain criteria.

Ohio Rev. Code § 3701.65, enacted on May 18, 2005, entitled "'Choose life' fund" provides as follows:

> (A) There is hereby created in the state treasury the "choose life" fund. The fund shall consist of the contributions that are paid to the registrar of motor vehicles by applicants who voluntarily elect to obtain "choose life" license plates pursuant to section 4503.81[5] of the Revised Code and any money returned to the fund under division (E)(1)(d) of this section. All investment earnings of the fund shall be credited to the fund.
>
> (B) (1) At least annually, the director of health shall distribute the money in the fund to any private, nonprofit organization that is eligible to receive funds under this section and that applies for funding under division (C) of this section.
>
> (2) The director shall distribute the funds based on the county in which the organization applying for funding is located and in proportion to the number of "choose life" license plates issued during the preceding year to vehicles registered in each county. Within each county, eligible organizations that apply for funding shall share equally in the funds available for distribution to organizations located within that county.
>
> (C) Any organization seeking funds under this section annually shall apply for distribution of the funds. The director shall develop an application form and may determine the schedule and procedures that an organization shall follow when annually applying for funds. The application shall inform the applicant of the conditions for receiving and using funds under division (E) of this section. The application shall require evidence that the organization meets all of the following requirements:
>
> (1) Is a private, nonprofit organization;
>
> (2) Is committed to counseling pregnant women about the option of adoption;
>
> (3) Provides services within the state to pregnant women who are planning to place their children for adoption, including counseling and meeting the material needs of the women;

---

[5]See Footnote 2.

-4-

(4) Does not charge women for any services received;

(5) Is not involved or associated with any abortion activities, including counseling for or referrals to abortion clinics, providing medical abortion-related procedures, or pro-abortion advertising;

(6) Does not discriminate in its provision of any services on the basis of race, religion, color, age, marital status, national origin, handicap, gender, or age.

(D) The director shall not distribute funds to an organization that does not provide verifiable evidence of the requirements specified in the application under division (C) of this section and shall not provide additional funds to any organization that fails to comply with division (E) of this section in regard to its previous receipt of funds under this section.

(E) (1) An organization receiving funds under this section shall do all of the following:

(a) Use not more than sixty per cent of the funds distributed to it for the material needs of pregnant women who are planning to place their children for adoption or for infants awaiting placement with adoptive parents, including clothing, housing, medical care, food, utilities, and transportation;

(b) Use not more than forty per cent of the funds distributed to it for counseling, training, or advertising;

(c) Not use any of the funds distributed to it for administrative expenses, legal expenses, or capital expenditures;

(d) Annually return to the fund created under division (A) of this section any unused money that exceeds ten per cent of the money distributed to the organization.

(2) The organization annually shall submit to the director an audited financial statement verifying its compliance with division (E)(1) of this section.

Ohio Rev. Code § 3701.65.

Ohio Rev. Code § 4503.91, as enacted on May 18, 2005, reads as follows:

(A) The owner or lessee of any passenger car, noncommercial motor vehicle, motor home, or other vehicle of a class approved by the registrar of motor vehicles may apply to the registrar for the registration of the vehicle and issuance of "choose life" license plates. The application for "choose life" license plates

-5-

may be combined with a request for a special reserved license plate under section 4503.40 or 4503.42 of the Revised Code. Upon receipt of the completed application and compliance with divisions (B) and (C) of this section, the registrar shall issue to the applicant the appropriate vehicle registration and a set of "choose life" license plates with a validation sticker or a validation sticker alone when required by section 4503.191 of the Revised Code.

In addition to the letters and numbers ordinarily inscribed on license plates, "choose life" license plates shall be inscribed with the words "choose life" and a marking designed by "choose life, inc." a private, nonprofit corporation incorporated in the state of Florida. The registrar shall review the design and approve it if the design is feasible. If the design is not feasible, the registrar shall notify "choose life, inc." and the organization may resubmit designs until a feasible one is approved. "Choose life" license plates shall bear county identification stickers that identify the county of registration by name or number.

(B) "Choose life" license plates and a validation sticker, or a validation sticker alone, shall be issued upon receipt of a contribution as provided in division (C) of this section and upon payment of the regular license tax prescribed in section 4503.04 of the Revised Code, any applicable motor vehicle tax levied under Chapter 4504 of the Revised Code, any applicable additional fee prescribed by section 4503.40 or 4503.42 of the Revised Code, a fee of ten dollars for the purpose of compensating the bureau of motor vehicles for additional services required in the issuing of "choose life" license plates, and compliance with all other applicable laws relating to the registration of motor vehicles.

(C)(1) For each application for registration and registration renewal received under this section, the registrar shall collect a contribution of twenty dollars. The registrar shall transmit this contribution to the treasurer of state for deposit in the "choose life" fund created in section 3701.65 of the Revised Code.

(2) The registrar shall deposit the additional fee of ten dollars specified in division (B) of this section for the purpose of compensating the bureau for the additional services required in issuing "choose life" license plates in the state bureau of motor vehicles fund created in section 4501.25 of the Revised Code.

Ohio Rev. Code § 4503.91.

On June 20, 2005, Defendants filed their Motion to Dismiss (Document #19).

Defendants argue that the Tax Injunction Act, 28 U.S.C. § 1341 (2000) ("the TIA"), divests this

Court of subject matter jurisdiction in this case because the charges for the "Choose Life" plates

-6-

constitute a tax, rather than a fee. The TIA prohibits a district court from enjoining the assessment, levy or collection of any tax under State law when State courts offer a "plain, speedy and efficient remedy." 28 U.S.C. § 1341. Plaintiffs argue that this Court has subject matter jurisdiction over their claims, alleging that the charge for the "Choose Life" plates constitutes a fee, rather than a tax, and therefore renders the TIA inapplicable. Further, Plaintiffs argue that even if some portion of the charge for "Choose Life" plates were considered a tax, rather than a fee, the TIA would not apply in this case.

## Discussion

Where the defendant asks the court to dismiss the plaintiff's claims for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), the court need only determine whether it has jurisdiction over the plaintiff's claims. The Sixth Circuit has adopted two standards of dismissal under Rule 12(b)(1), depending upon whether the movant makes a facial or factual attack on the plaintiff's complaint. *See Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). A facial attack merely questions the sufficiency of the pleadings. In reviewing a facial attack, the court shall apply the same standard applicable to Rule 12(b)(6) motions. That is, the Court will consider the material allegations of fact set forth in the complaint as being true and construe them in a light most favorable to the nonmoving party. *See, U.S. v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994); *Cooley v. United States*, 791 F. Supp. 1294 (E.D. Tenn. 1992).

This Court must determine whether the license plate charge at issue constitutes a tax, rather than a fee, for purposes of the TIA, thereby depriving this Court of subject matter jurisdiction over Plaintiffs' claims. The Court in *Home Builders Ass'n of Miss., Inc. v. City of*

*Madison*, 143 F.3d 1006 (5th Cir. 1998), explained the differences between a classic tax and a classic fee as follows:

> The classic tax sustains the essential flow of revenue to the government, while the classic fee is linked to some regulatory scheme. The classic tax is imposed by a state or municipal legislature, while the classic fee is imposed by an agency upon those it regulates. The classic tax is designed to provide a benefit for the entire community, while the classic fee is designed to raise money to help defray an agency's regulatory expenses.

*Id.* at 1011. As noted by both Plaintiffs and Defendants, where the charge falls near the middle of the spectrum between a classic tax and a classic fee, the predominant factor for review is the revenue's ultimate use. *Am. Landfill, Inc., v. Stark/Tuscarawas/Wayne Joint Solid Waste Mgmt. Dist.*, 166 F.3d 835, 838 (6th Cir. 1999). "When the ultimate use is to provide a general public benefit, the assessment is likely a tax, while an assessment that provides a more narrow benefit to the regulated companies is likely a fee." *Id.*

Courts use this "spectrum" analysis, placing the charge at issue on a spectrum, with a classic tax at one end, and a classic fee at the other, as well as a three-factor analysis, in determining whether a charge constitutes a tax or a fee. Under the three-factor analysis, the Court considers: (1) the entity that imposes the assessment; (2) the parties upon whom the assessment is imposed; and, (3) whether the assessment is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed. *Am. Landfill, Inc.*, 166 F.3d 835, 837 (citing *Bidart Bros. v. Cal. Apple Comm'n*, 73 F.3d 925, 931 (9th Cir. 1996); *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of P.R.*, 967 F.2d 683, 685 (1st Cir. 1992)).[6] Courts often use a combination of the spectrum and three-factor approach in

---

[6] "An assessment imposed directly by the legislature is more likely to be a tax than an

-8-

determining whether a charge constitutes a fee or a tax. *Am. Landfill*, 166 F.3d 835, 839-40; *Hedgepeth v. Tennessee*, 215 F.3d 608, 613-14 (6th Cir. 2000).

The issue of whether the charge for a license plate constitutes a fee or a tax for purposes of the TIA is not one of first review. The Fifth Circuit, in *Henderson v. Stalder*, 407 F.3d 351 (5th Cir. 2005), reviewed a license plate charge for "Choose Life" license plates in Louisiana, finding the charge to be a tax, rather than a fee. The Louisiana statute at issue provides for license plates bearing the words "Choose Life" to be available to vehicle owners for a $25.00 charge, in addition to the regular motor vehicle license fee, plus a handling fee of $3.50 to offset administrative costs. The money from the sale of the license plates is deposited into the state treasury and distributed in the form of grants according to the recommendations of the "Choose Life Advisory Council." Conditions are placed on the use of the funds and those receiving the grants must demonstrate that they provide counseling and other services for expectant mothers who are considering adoption and must demonstrate that they are not involved in or associated with counseling for, or referrals to abortion clinics, providing medical abortion-related procedures, or pro-abortion advertising. Further, an organization receiving grant money from the sale of the license plates must use at least half of the funds to provide for the material needs of expectant mothers considering adoption including clothing, housing, medical care, food, utilities and transportation. The funds may also be used to meet the material needs of infants awaiting placement with adoptive parents. Remaining funds may be used for counseling, training, and

---

assessment imposed by an administrative agency." *Bidart Bros.* 73 F.3d 925, 931 (citing *San Juan Cellular*, 967 F.2d 683, 685). "An assessment imposed upon a broad class of parties is more likely to be a tax than an assessment imposed upon a narrow class." *Id.*

pregnancy testing. La. Rev. Stat. § 47:463.61. The Louisiana statutory provisions are quite similar to the Ohio statutory provisions at issue in this case.

The Court in *Henderson*, 407 F.3d 351, analyzed Louisiana's statutory scheme for the provision of "Choose Life" license plates, discussing that the charge for the plates is set directly by the State legislature, even if the funds are collected by the State's motor vehicle unit; that the $25.00 charge is in addition to ordinary motor vehicle registration fees, is not related to the regulatory function of the Bureau of Motor Vehicles, and is a source of revenue for the government; and, that the funds collected from specialty license plate charges are used for a wide variety of beneficial purposes ranging from park development to university education to adoption support. *Id.* at 357-58. Therefore, the Court found the license plate charge to be a tax, rather than a fee.

The Court in *Henderson* examined the argument that the charges for the plates are paid voluntarily by vehicle owners, whereas taxes are normally considered to be involuntary charges. The Court found this to be a "superficial distinction," citing many voluntary activities such as building a home; engaging in a regulated industry; or, obtaining permission to park in handicapped parking spaces as being voluntary activities which are taxed. The Court reasoned that it is not the taxpayer's motivation, but rather "the government's purpose in exacting the charge" that distinguishes taxes from fees. *Id.* at 358. The Court of Appeals also examined the argument that the "variability of the additional charges" among specialty plates cannot "benefit the entire community" because they "are linked to some regulatory scheme - - if not a charitable scheme." *Id.* The Court of Appeals reasoned that the additional charges, however, "'regulate' nothing; they defray no costs of the program itself, as those costs are embodied in the separate,

-10-

minimal handling fee." *Id.*

Defendants in this case also point to the Sixth Circuit decision in *Hedgepeth v. Tennessee*, 215 F.3d 608 (6th Cir. 2000). In *Hedgpeth*, the Sixth Circuit Court of Appeals held that Tennessee's $20.50 charge for handicap placards qualified as a tax under the TIA. *Id.* at 612. The Sixth Circuit reasoned that the ultimate purpose of the charge was general public benefit because the revenue raised was directed to the general welfare of the citizens of Tennessee (the revenue was deposited into the State treasury then allocated to the Tennessee highway fund, the general fund, the police pay supplement fund, and the trooper safety fund); that the substantial difference between the charge for the placard and the actual coast of the placard indicated that the charge was a revenue raising tool; and, that the charges were authorized by statute and that the State legislature specified distribution of the funds. *Id.* at 612-614.

This Court finds both *Henderson* and *Hedgepeth* to be persuasive. Charges for the "Choose Life" specialty license plates are set directly by the Ohio legislature; the $20 additional charge for "Choose Life" specialty plates is in addition to ordinary motor vehicle registration fees, is not related to the regulatory function of the Ohio Bureau of Motor vehicles and is a source of revenue for the government; and, the funds are used for purposes which benefit the community. There is an arguable benefit to the public in providing funding for adoption-related services, separate and apart from any political or ideological arguments involved. As noted by the Court in *Henderson*, while a plaintiff's view of the public benefit served by these expenditures may differ from that of the legislature, it does not transform an additional charge for specialty plates into a fee designated for a "regulatory" purpose. Based on the reasoning of the courts in both *Henderson* and *Hedgepeth*, this Court finds the charge for "Choose Life" license

-11-

plates to constitute a tax, rather than a fee.

Plaintiffs argue that "the entire $30 charged by the Ohio BMV to motor vehicles [sic] owners purchasing a "Choose Life" license plate is a fee because it is for each motor vehicle owner's personal benefit and not some general public benefit." Plaintiffs argue that because the fee is voluntary, it provides only an individual benefit to a particular car owner, not to society as a whole. While license plate owners may contemplate the benefits of the purchase of specialty plates for themselves, to express their beliefs and to give funds to those entities promoting their beliefs, such a benefit to the purchaser does not preclude a determination that the charge serves a public purpose. State revenue is raised through many voluntary purchases, including the purchase of alcohol and cigarettes.[7] Further, Plaintiffs' argument fails to recognize the fact that classic fees are based on the costs of regulation. The charges for "Choose Life" license plates in Ohio are not based on the costs of regulation.[8]

---

[7]

As stated above, the State taxes various items which individuals voluntarily purchase. For example, the State taxes wine, pursuant to Ohio Rev. Code § 4301.43(B), for the purpose of providing revenue for the support of the State and encouraging the grape industries of the State. The legislature has allocated a portion of the wine tax for the Ohio Grape Industries Fund to provide funding for the research, development and marketing of grape products in Ohio. See Ohio Rev. Code § 924.51-.55. An individual purchases wine for his own benefit, and may indeed believe that the research, development and marketing of grapes in Ohio is worthwhile and/or necessary. However, the state of mind of the purchaser does not convert the wine tax into a fee.

[8]

Plaintiffs also argue that the revenue collected from the sale of "Choose Life" license plates "is simply money passing through an empty conduit; it is not money that is enriching the state nor is the state paying for some public good. The 'Choose Life' Fund is nothing more than a mechanism for funneling charitable donations from private donors to non-profit groups that meet select criteria." Plaintiffs' Response Brief at p. 8. However, this Court finds no support for the argument that state tax revenue designated by the legislature for the support of private organizations meeting certain criteria is excluded from being characterized as "enriching the state" or "paying for some public

-12-

Plaintiffs also argue that the application of the TIA should not bar subject matter jurisdiction in this case. Plaintiffs argue that this lawsuit falls outside the purview of the TIA under the decision in *Hibbs v. Winn*, 542 U.S. 88, 124 S. Ct. 2276 (2004). Specifically, Plaintiffs cite *Hibbs* for the proposition that "the TIA's jurisdictional limitations only apply to 'cases in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes.'" Plaintiffs' Response Brief at p. 10 (citing *Hibbs*, 124 S. Ct. 2276, 2289.) However, in *Hibbs*, the Supreme Court held that the TIA did not bar suit where (1) the plaintiffs were not seeking to contest their own tax liability; and, (2) the plaintiffs were not seeking to impede the state's receipt of tax revenues. *Hibbs*, 542 U.S. 88. In distinguishing *Hibbs*, the *Henderson* court did not follow the narrow interpretation suggested by Plaintiffs. *See Henderson*, 407 F.3d 351, 359 ("Hibbs opened the federal courthouse doors slightly notwithstanding the limits of the TIA, but it did so only where (1) a third party (not the taxpayer) files suit, and (2) the suit's success will enrich, not deplete, the government entity's coffers."). Although Plaintiffs admittedly are not seeking to contest their own tax liability, this Court agrees with Defendants that the relief sought by Plaintiffs from this Court would in fact reduce tax revenues.[9] Therefore, the TIA deprives this

---

good" solely on the basis that it is being used by private groups. As stated above, although there may be differences in opinion as to the beneficial use of tax revenue, it is arguable that providing funds for adoption-related services benefits the public, aside from any political or ideological arguments involved.

[9] Plaintiffs' Complaint seeks injunctive relief, asking the Court to declare the current statutory scheme unconstitutional under the First and Fourteenth Amendments to the United States Constitution and either (1) enjoin enforcement of the Act; (2) enjoin enforcement of Ohio's statutory scheme for specialty license plates; or, (3) order Defendants to open the specialty license plate process to all applicants who meet neutral and objective criteria. In essence, the relief sought by Plaintiffs under their First and Second Claims for Relief would extinguish the First Amendment rights of those who

-13-

Court of subject matter jurisdiction over Plaintiffs' claims. See *Henderson v. Stalder*, 407 F.3d 351, 358-59.[10]

Further, this Court finds that the Ohio courts provide a "plain, speedy and efficient remedy" for purposes of the TIA. 28 U.S.C. § 1341. A state court remedy is considered to be "plain, speedy and efficient" so long as it "provides the taxpayer with a full hearing and judicial determination at which she may raise any and all constitutional objections to the tax." *Rosewell v. LaSalle National Bank*, 450 U.S. 503, 514 (1981). Plaintiffs may raise any and all constitutional objections to the "Choose Life" license plate scheme in the Ohio courts. This

---

have gone through the legislative process to establish and/or obtain "Choose Life" and/or other specialty plates. As set forth above, this would also reduce state revenues. Plaintiffs argue that their third requested relief falls under the dicta in *Henderson*, 407 F.3d 351, 359-60, in which the court expressed its disagreement with the injunction obtained by the plaintiff in that case, stating that such a remedy closes down the forum and censors the speech of others. The Court in *Henderson* went on to state that had the plaintiff sought relief from the court opening the forum for herself, the relief would have increased rather than decreased state revenues, thus *Hibbs* would apply. However, in this case, like in *Henderson*, Plaintiffs have asserted a broad, "facial challenge to the entire overall policy and practice" under which the state "makes available certain specially designed license plates." *Henderson*, 407 F.3d 351,353. Plaintiffs' third request for relief requests a declaration that Ohio's policy and practice of approving specialty license plates is an unconstitutional infringement of Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution and an order from this Court requiring that Defendants and their successors open the specialty license plate process to all applicants who meet neutral and objective criteria. Plaintiffs have not asked this Court for injunctive relief allowing their message to be placed upon a specialty license plate. Therefore, the *Henderson* dicta relied upon by Plaintiffs does not persuade the Court to bar application of the TIA in this case.

[10] Plaintiffs cite several other cases in which courts examined statutes affecting state revenues without discussing the application of the TIA. However, in this case, Defendants argue that the TIA divests this Court of subject matter jurisdiction over Plaintiffs' claims. As stated above, based on both *Henderson* and *Hedgepeth*, this Court agrees.

-14-

Court does not find any circumstances in this case which warrant an exception to the TIA. Accordingly, Plaintiffs' case must be dismissed.

### Conclusion

Based on the foregoing, Defendants' Motion to Dismiss (Document #19) is hereby GRANTED.

IT IS SO ORDERED.

*/s/ Donald C. Nugent*
DONALD C. NUGENT
United States District Judge

DATED: *September 27, 2005*